***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Harris with minor modifications.
 ***********
Following the hearing before the Deputy Commissioner, the parties submitted a Consent Order, which was approved by Deputy Commissioner Harris and filed on February 13, 2009. The Consent Order disposed of all of the hearing issues but the following:
 ISSUES
1. Whether Plaintiff is entitled to attorney's fees under N.C. Gen. Stat. § 97-88.1. *Page 2 
2. Whether Plaintiff's current job with Defendant-Employer constitutes suitable employment.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated, and there is no question as to misjoinder or nonjoinder of parties.
4. The carrier on the risk for Defendant-Employer in this claim was Zurich Insurance Company.
5. Plaintiff sustained a compensable injury to her right wrist on May 20, 2005, arising out of and in the course and scope of her employment.
6. An employment relationship existed between the employee and employer on May 20, 2005.
7. Plaintiff's average weekly wage is $128.35, yielding a compensation rate of $85.64.
8. Defendants filed a Form 33 Request for Hearing on or about April 15, 2008, stating that "Defendants seek a determination of the degree of permanent partial disability *Page 3 
stemming from the initial injury to Plaintiff's right wrist arising out of and in the course of her employment with Employer-Defendant."
9. A mediation was held and impassed on August 13, 2008.
 *********** EXHIBITS
The following documents were accepted into evidence as stipulated exhibits:
 • Exhibit 1: Executed Pre-Trial Agreement
 • Exhibit 2: Industrial Commission Forms
 • Exhibit 3: Plaintiff's medical records (supplemented by post-hearing submission of 9/30/08 office note from Dr. Moore)
Transcripts of the depositions of the following were also received post-hearing:
 • Dr. Richard Moore
 • Dr. Patrick Boylan (with Exhibit 1)
 • Dr. Howard Johnson
 • Jerri L. Patterson, ANC-P
 *********** EVIDENTIARY RULINGS
The objections raised by counsel at the depositions taken in this matter are ruled upon in accordance with the law and the opinion in this Opinion and Award.
 ***********
Based upon all of the competent credible evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT *Page 4 
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was 48 years old. Plaintiff is right-handed.
2. Defendant-Employer is a clothing retailer. On the date of injury, Plaintiff was working as a sales associate in Defendant-Employer's Rockingham store when she injured her right wrist taking a sensor off some merchandise. The sensor had become bent, and as Plaintiff was tugging and twisting the sensor, she heard a pop in her wrist and felt immediate pain.
3. Plaintiff was initially seen at the Richmond Memorial Hospital Emergency Department, where following an x-ray she was diagnosed with a wrist strain/sprain and provided with a splint. Plaintiff was directed to follow up with the Pinehurst Surgical Clinic is the pain persisted.
4. Plaintiff's pain persisted, and in June 2005 Plaintiff saw Dr. Ralph E. Carter, III, at Scotland Orthopedics. Following a CT scan, Dr. Carter tentatively diagnosed Plaintiff with traumatic exacerbation of chronic degenerative process of the right wrist, as well as possible Kienbock's disease. Dr. Carter restricted Plaintiff to no lifting over two pounds with her right hand and referred Plaintiff to Dr. Richard S. Moore at the Wilmington Orthopaedic Group.
5. Plaintiff presented to Dr. Moore on September 29, 2005, at which time Dr. Moore tentatively diagnosed Plaintiff with ulnar impaction syndrome and referred her for an MRI. On November 1, 2005, Dr. Moore reviewed the MRI and diagnosed Plaintiff as having ulnar impaction syndrome with a triangular fibrocartilage complex (TFC) tear.
6. On December 14, 2005, Dr. Moore performed a right wrist arthroscopy with TFC debridement and ulnar shortening osteotomy. The osteotomy included the implantation of a metal plate. *Page 5 
7. Following this first surgery, Plaintiff was placed in a short-arm cast and was released to return to work with no use of her right arm. She continued to heal from the surgery and progressed from the cast to a custom-made splint.
8. Plaintiff continued to have significant pain and tenderness in her right wrist. Following EMG and nerve conduction studies on her right arm that confirmed a mild right ulnar neuropathy, Dr. Moore found Plaintiff to be irritable at the ulnar nerve at her elbow. Dr. Moore assessed that these symptoms were, more likely than not, related to her May 21, 2005, injury, with an exacerbation of an underlying neuropathy.
9. Dr. Moore recommended an ulnar nerve transposition, and he performed this procedure on Plaintiff on May 15, 2006. Following the surgery, Plaintiff was again returned to work with no use of her right arm.
10. In July 2006, Plaintiff had a recurrence of her right arm pain. Dr. Moore felt that these symptoms were caused by the plate that had been inserted during the osteotomy, and he recommended that a plate removal should be considered when Plaintiff was one year out from the first surgery. He continued her work restrictions.
11. On August 23, 2006, following a significant course of physical therapy, Plaintiff's physical therapist stated that the prognosis for further physical therapy was poor.
12. In the latter half of 2006, Dr. Moore recommended pain management for Plaintiff, but it was not immediately approved.
13. On January 3, 2007, Plaintiff presented to Dr. Boylan for pain management, upon Dr. Moore's referral. Dr. Boylan prescribed medications and advised Plaintiff to use ice after work should she have swelling. *Page 6 
14. On January 9, 2007, Plaintiff saw Dr. Moore. He restricted plaintiff to no lifting or carrying greater than five pounds with her right arm, and no repetitive motion with her right arm. He also advised her to work in her elbow pad and recommended removal of the plate from her right arm.
15. Dr. Moore performed the plate removal on February 5, 2007. Plaintiff returned to work as previously restricted.
16. On February 28, 2007, Plaintiff returned to Dr. Boylan, reporting that her right wrist pain was averaging 9/10, as well as night sweats, swelling, insomnia and other complaints.
17. Plaintiff returned to Dr. Moore on March 30, 2007. Dr. Moore noted that Plaintiff "had done exceptionally well since her hardware removal" and that she was "anxious to return to full activity." Dr. Moore opined that Plaintiff had "essentially reached maximal medical improvement." He released her without restrictions, although he and she did discuss the types of jobs that she should seek. Dr. Moore told Plaintiff that she should perform activities as tolerated, using her common sense as a guide. Dr. Moore assigned a 15 percent permanent partial impairment (PPI) rating for the right upper extremity and agreed to see Plaintiff back as needed.
18. During his deposition, Dr. Moore explained that he had specifically advised Plaintiff against jobs performing highly repetitive or production type activities. However, Dr. Moore did not believe Plaintiff's position with Defendant-Employer to be such a job, as his understanding was that she would be involved in different activities over the course of the day. Dr. Moore did not assign Plaintiff any permanent restrictions on March 30, 2007, because of Plaintiff's eagerness to return to full activity. *Page 7 
19. Plaintiff also saw Dr. Boylan on March 30, 2007, and reported to him that her pain was constant and averaged 8/10. Dr. Boylan also released Plaintiff to work without any specific restrictions.
20. Plaintiff continued to treat with Dr. Boylan, and she continued to have increasing pain in her right arm, especially down near her wrist. He recommended nerve conduction studies, which came back normal. Dr. Boylan continued to prescribe multiple medications, but Plaintiff's pain remained at the 9/10 level.
21. On May 20, 2007, Plaintiff hit her elbow at work and had to go to her local emergency room for the resulting severe pain.
22. During this time, Plaintiff continued to work part-time as a sales associate with Defendant-Employer with no specific restrictions. As of the hearing, Plaintiff had not missed any scheduled work since March 30, 2007.
23. On July 31, 2007, Plaintiff returned to Dr. Moore upon Dr. Boylan's recommendation. She felt that her pain was worsening, but her clinical examination was basically unchanged. Dr. Moore noted that Plaintiff had some sensitivity over her ulnar forearm scar, but he referred her back to Dr. Boylan for an adjustment of her pain management regimen.
24. Plaintiff again went to the emergency room for right arm pain on July 17, 2007.
25. Dr. Boylan, who was at that time in Wilmington in Dr. Moore's practice, felt that Plaintiff should establish with a doctor closer to home for her pain management needs, and he stated as such several times in his notes. By late 2007, arrangements had been made for Dr. Johnson, Plaintiff's primary care physician, to take over her medication management, with returns to Dr. Moore as needed. *Page 8 
26. Plaintiff began treating with Dr. Johnson in this claim on December 10, 2007. He continued monitoring her medications, but she continued to have pain.
27. Defendants filed their Form 33 on April 15, 2008, requesting a determination of the permanent partial disability compensation due Plaintiff.
28. On April 25, 2008, Dr. Johnson began trying to get Plaintiff back in to see Dr. Moore.
29. Plaintiff saw Dr. Moore on September 30, 2008. While Dr. Moore continued to feel that surgical intervention had largely been maximized, he did have concerns over the progression of her numbness and tingling, and he recommended that she consult with Dr. Boylan for possible repeat electrical studies.
30. The September 30, 2008, office note from Dr. Moore was not available to the parties until after the hearing before the Deputy Commissioner.
31. In August 2008, Defendant-Employer promoted Plaintiff to second assistant manager at the Rockingham store and gave her a raise. Defendant-Employer offered Plaintiff the position, and she freely accepted it. In that position, Plaintiff's duties include making deposits, sending and responding to emails, and performing audits. Defendant-Employer accommodates Plaintiff's right arm limitations by not requiring her to vacuum, sweep, dust, clean the bathroom, lift freight, or get on her hands and knees to do stocking.
32. The heaviest thing that Plaintiff lifts now in her job is a shoe box, which weighs about two pounds.
33. On some days when Plaintiff is at work, her pain is so severe she essentially does no physical activities, and her co-workers cover for her. *Page 9 
34. Plaintiff does not have to do all the duties that the prior second assistant manager did, such as unloading large boxes. Plaintiff does not believe that she could do her job if Defendant-Employer did not accommodate her.
35. There is no written job description for the second assistant manager position in evidence.
36. There is no evidence in the record to suggest that the second assistant manager position, even with the accommodations offered to Plaintiff, is not an actual job that Defendant-Employer offers to its employees and prospective employees.
37. Dr. Moore testified that when he found Plaintiff to be at maximal medical improvement (MMI) on March 30, 2007, it was from the orthopedic standpoint only, based on his opinion at the time that Plaintiff had no more surgical options. As he further testified, Dr. Moore believed that Plaintiff could perform her pre-injury job as tolerated, and that she should avoid vacuuming, removing sensors, and getting on her hands and knees because of the wrist flexion required. Dr. Moore indicated that Plaintiff should avoid highly-repetitive, production-type jobs, and this would include an office job with significant typing. However, Dr. Moore thought it was reasonable that Plaintiff could lift five to ten pounds.
38. Dr. Boylan testified that the numbness and tingling that Dr. Moore noted on September 30, 2008, was different from that which Dr. Boylan had noted earlier, in that the numbness and tingling were now specifically over the ulnar nerve distribution rather than just widespread as before.
39. Dr. Johnson testified that during his treatment of Plaintiff from December 2007 through April 2008, he did not see any changes in Plaintiff's condition. Rather, he just saw ongoing, steady pain with no progressive decline. *Page 10 
40. The Full Commission finds the testimony of Plaintiff's treating physicians to be credible.
41. In the Consent Order filed on February 13, 2009, the parties agreed that Plaintiff had not yet reached MMI, that she was entitled to further pain management and a psychiatric evaluation and further mental health treatment as recommended by the evaluator, that she was entitled to the further diagnostic testing recommended by Drs. Moore and Boylan, that Dr. Moore would remain her treating orthopedist, and that she was entitled to a second opinion evaluation pursuant to N.C. Gen. Stat. § 97-27.
42. Based on the evidence of record, the Full Commission finds that Defendants' prosecution of this matter was not based on stubborn, unfounded litigiousness, but instead that it was brought with reasonable grounds.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. The Full Commission concludes that Defendants had reasonable grounds in this case for filing and prosecuting their Form 33 Request for Hearing on the issue of Plaintiff's permanent partial disability for her compensable right wrist injury. As such, Plaintiff is not entitled to attorney's fees under N.C. Gen. Stat. § 97-88.1.
2. Plaintiff's current position with Defendant-Employer, as modified to accommodate her physical limitations related to her compensable right wrist injury, is physically suitable employment for Plaintiff. See, e.g., Peoples v. Cone MillsCorp., 316 N.C. 426, 342 S.E.2d 798 (1986). *Page 11 
3. Plaintiff's current position with Defendant-Employer, as modified to accommodate her physical limitations, is not so heavily modified as to render it "make work":
 The tendered employment must accurately reflect the employee's ability to compete with others in the job market in order for the employment to be indicative of an employee's earning capacity. Thus, "if other employers would not hire the employee with the employee's limitations at a comparable wage level . . . [or] if the proffered employment is so modified because of the employee's limitations that it is not ordinarily available in the competitive job market," the job is "make work" and is not competitive.
Jenkins v. Easco Aluminum,165 N.C.App. 86, 598 S.E.2d 252 (2004) (quoting Peoples v. ConeMills Corp., 316 N.C. 426, 342 S.E.2d 798 (1986)). Plaintiff's position with Defendant-Employer as a second assistant manager is a position that existed before it was ever offered to Plaintiff. Although Plaintiff does not perform all of the duties that were performed by her predecessor in that position due to the accommodations made by Defendant-Employer, Plaintiff has failed to show that those accommodations render Plaintiff's current position so different from the position as it had existed before that the current position would not be offered in the competitive job market.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 ORDER
1. Plaintiff's claim for attorney's fees is DENIED.
2. Defendants shall pay the costs. As part of their costs, if they have not done so already, Defendants shall pay expert witness fees to each of the following providers in the amount shown or the amount actually billed, whichever is less: Dr. Johnson, $354.00, and Ms. *Page 12 
Patterson, $213.00. Expert witness fees for Drs. Moore and Boylan in were set by the Deputy Commissioner in Orders filed on November 18, 2008.
This the 16th day of December, 2009.
S/___________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ PAMELA T. YOUNG CHAIR
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER